## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH L. SMYTH,

                Plaintiff,

    v.

WAWA, INC.,

                Defendant

CIVIL ACTION

No. 06-4474

Pollak, J.                                                                                    March 19, 2008

### OPINION

Plaintiff Deborah L. Smyth has brought this action against her former employer, defendant Wawa, Inc., under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). Before the court is defendant's motion for summary judgment. The court held a hearing on the motion on February 29, 2008. For the reasons given below, the court will grant the motion in part and deny it in part.[1]

### I.

Plaintiff was employed by defendant from 1981 until her termination in October 2004. She began her employment as a mail clerk, eventually rising to the position of

---

[1] Plaintiff has withdrawn her claims under the Pennsylvania Human Relations Act, contained in count III of her complaint. *See* Pl. Resp. 32 n.4; Compl. ¶¶ 42-45. Defendant's motion for summary judgment will therefore be dismissed as moot with respect to those claims.

quality assurance assistant.  In this position, plaintiff was responsible for handling

problems with products sold by Wawa stores.  Plaintiff processed complaints from

customers and stores using a computer system called Applix and contacted the vendors

who supply Wawa with products to resolve problems and prevent them from recurring.

Plaintiff reported to supervisor Jane Griffith.  *See* Smyth Dep. 17-20.

    In June 2000, suffering from degenerative disk disease in her neck, plaintiff sought

and received leave from Wawa in order to undergo surgery to fuse two vertebrae.  She

returned to work in November 2000, approximately five months after her surgery.

Griffith Dep. 98; Pl. Resp. Exhs. 11-12.  Upon her return to work, she requested and was

given a telephone headset to prevent neck pain.  Smyth Dep. 174-75.

    Following her neck surgery, plaintiff also requested a laptop computer so that she

could work at home during nights and weekends, in part to make up work she missed for

doctors' appointments and sick days.  Smyth Dep. 55, 214-15.  Many of the other

employees in her department had laptops that they brought home.  *Id*. at 167-70.  Plaintiff

was not given a laptop.  *Id*. at 229.

    In December 2002, plaintiff went on leave, designated as FMLA leave, for surgery

on her left knee.  Her knee surgeon's notes reflect that plaintiff had "been experiencing

recurrent episodes of catching and locking within her knee."  Pl. Resp. Exh. 18.

Although she was initially "able to shake her knee and her symptoms would resolve," she

injured it further while stepping over a pile of clothing, after which she was unable to

place weight on the knee or move her leg.  *Id*.  Following this injury, in January 2003, she

underwent surgery to repair a torn meniscus.  *Id*.  She returned to work in March 2003.

*See* Pl. Resp. Exh. 12.  Her surgeon also noted indications of "a chronic deficiency of the

anterior cruciate ligament" ("ACL") in her left knee and suggested that reconstruction of

the ligament might be necessary in the future.  Pl. Resp. Exh.18.

Plaintiff was afraid of losing her job due to her continual need to take time off for

medical reasons.  Plaintiff's doctor noted in her chart in July 2004 that plaintiff was

"[v]ery anxious over losing [her] job."  *See* Pl. Resp. Exh. 26.  Plaintiff testified in her

deposition that Griffith told plaintiff that she was in danger of losing her job if she missed

more work.  Smyth Dep. 170-80.  Plaintiff sought advice from her Wawa colleagues

regarding how to break the news to Griffith that she would need to leave for another knee

surgery.  Plaintiff Smyth Dep. 159-61.

On June 22, 2004, plaintiff sent a memorandum to Griffith informing her that she

would be taking leave to have the ACL surgery on her knee on July 30, 2004.  Pl. Resp.

Exh. 25.  The memorandum conveyed plaintiff's apprehension about losing her job:

> I attempted to wait as long as I could to schedule this [surgery]; but unfortunately,
> can no longer wait as my condition is worsening.  I am informing you of this now
> because I feel that upon my return from Disability, it is imperative that we sit down
> with Human Resources and your Supervisor to discuss placing me into another
> suitable position than with the Quality Assurance Department.  I believe that we
> discussed the concerns that you conveyed in your memo that I am not meeting my
> expectation of this job task during my evaluation at which time I conveyed my
> concerns and suggestions and feel that they have not been addressed.
> . . .
>            I also, during my evaluation, requested and offered that I be provided a
> laptop to work from home as this would allow me to do a lot of work that would
> help me to keep caught up and be able to do reporting as you have also requested.
> . . .

-3-

> I cannot help but feel that my medical conditions which I also have discussed with you and have tried to explain is not my fault or choice to have is some of the reason for your dissatisfaction in my work that you have stressed and am not fully satisfied that there is no worry of losing the job which I have worked so hard at for 24 ½ loyal years.  I am fully aware that handling Applixes is my Job responsibility and feel that I am meeting the expectations of this job task as efficiently as anyone performing this responsibility would.

Pl. Resp. Exh. 25.

Plaintiff's request for leave was approved.  In an e-mail dated July 28, 2004, explaining how plaintiff would be compensated for the first week of her leave,[2] Griffith referred to the date plaintiff was to return to work as being October 25, "(12 weeks from July 30)."  Compl. Exh. A. 2.  Griffith testified that she calculated the October 25th date by counting twelve weeks from Friday, July 30, to Friday, October 22.  Griffith provided plaintiff with the date October 25 rather than October 22 because she "figured that if [plaintiff] was due back on the 22nd, that she wouldn't start until the 25th because the 22nd was a Friday."  Griffith Dep. 116.

After plaintiff's leave had begun, on August 12, 2004, Wawa sent plaintiff a letter confirming that Wawa had approved her request for disability leave, to be designated as FMLA leave.  Smyth Dep. Exh. 9.  Although the letter informed plaintiff that she was eligible for twelve weeks of FMLA leave during a twelve-month period, the letter did not state a specific end date for her leave or mention whether she had already taken any FMLA leave during the preceding twelve months.  *See id*.

---

[2] Under Wawa's disability insurance policy with Unum Provident, an employee is not eligible for disability benefits until seven days after the onset of the disability.  *See* Smith Dep. Exh. 15.

In addition to informing Griffith about her intention to take disability leave, plaintiff contacted defendant's disability insurer, Unum Provident, to seek approval for her disability leave.  Smyth Dep. 231.  On August 12, 2004, Unum Provident sent plaintiff a letter informing her that her request for short term disability benefits had been approved, with payment through September 23, 2004 and extensions available thereafter if plaintiff provided sufficient documentation of a continuing disability.  Smyth Dep. Exh. 15.

The record does not contain any communication from Wawa to plaintiff regarding the date her FMLA leave would end other than the e-mail from Griffith to plaintiff referring to the expectation that plaintiff would return to work on October 25, 2004.[3] Plaintiff testified at her deposition that she did not receive any other communication from Wawa regarding the date she was scheduled to return to work, and that she believed she was due back on October 25th, based on Griffith's e-mail.  Smyth Dep. 93-94, 230-31.

During plaintiff's leave, plaintiff called Griffith approximately weekly with updates on her progress, and Griffith has notes of some of plaintiff's messages and calls. *See* Griffith Dep. 120-21; Smyth Dep. 88-89.

Most significant among Griffith's notes is the note dated October 11, 2004, which

---

[3] Defendant's memorandum in support of its motion for summary judgment states, "The 12-week period ended on October 22, 2004 — 12 weeks from July 30, 2004."  In support, the memorandum cites two portions of plaintiff's deposition where plaintiff acknowledged that, counting on a calendar, twelve weeks from July 30 is October 22; deposition testimony from Karen Toren, a Wawa human resources manager, acknowledging the same; and exhibit 36 from plaintiff's deposition — simply a copy of a calendar of the year 2004.  Def. Mot. 6.

recounts certain events preceding that date, as well as a conversation between Griffith and plaintiff that took place on October 11.  The note states that plaintiff left Griffith a message on October 4 reporting that plaintiff had a doctor's appointment scheduled for October 7, and that she would call with an update.  Plaintiff "expected to be back to work on Monday Oct 11 but would call if something different."  Griffith Dep. Exh. P-19. Consistent with this note, Griffith testified in her deposition that plaintiff "was expected to be back on October 11th and in her message to me that she left, she would call if something different."  *Id*. at 124.  The note goes on to state that "Debbie did not show on Monday October 11th," and that Griffith called the human resources center to ask whether plaintiff had called the center.  According to the note, the center's response was that "she had not called but they didn't think she would or needed to."  Griffith Dep. Exh. P-19.  Griffith testified that the human resources center told Griffith that plaintiff's FMLA's leave was to end on October 7, and that she should have returned on Friday, October 8, but that it was okay if Griffith allowed her to return on Monday, October 11. Griffith Dep. at 125; *see* Griffith Dep. Exh. P-19 ("HR Center told me that her (Debbie) short-term disability & FMLA was up on Oct 7 = should have returned to work Oct 8 but it was okay for me to have her return on Oct. 11").

Griffith testified that it did not occur to her that this October 11th date was two weeks earlier than the date she had told plaintiff, October 25th, "[b]ecause the HR call center and the insurance company are the official people that represent that."  *Id*. at 125-26.  Griffith testified, "I don't even know I if [sic] remembered I had written that letter at

this time." *Id*. at 126.

Following Griffith's inquiry to the human resources center, later in the day on

October 11, 2004, plaintiff and Griffith spoke.  There is conflicting evidence regarding

what transpired during the conversation.  Griffith testified at her deposition, and her

October 11 note indicates, that plaintiff told Griffith that her knee needed draining and

more therapy, and that plaintiff felt she would be unable to return to work before her next

doctor's appointment, on October 30.  Griffith Dep. 126-27; *see* Griffith Dep. Exh. P-19.[4]

Plaintiff testified in her deposition that she told Griffith that she was not sure whether she

would be able to return to work as scheduled, but that, "as far as [plaintiff] knew,

[plaintiff] was anticipating to come back as expected on the 25th."  Smyth Dep. 184.

On October 21, 2004, Karen Toren, a human resources manager at Wawa, sent

plaintiff a letter informing plaintiff:

> As of July 29, 2004, you began your FMLA leave from Wawa due to your health
> condition.  As you are aware, you were eligible for up to twelve weeks of FMLA
> leave.  At this time, your FMLA time has expired.  Due to the business needs of
> the organization, we must fill your vacant position, which has been transferred
> from Quality Assurance to the Wawa Call Center and will be reporting to Mike
> Subin.
>
>         Should you be interested in future employment with Wawa, please contact

---

[4] The relevant portion of the note states:
> 1) Debbie said "her back was 'out' & she was in terrible pain" she had a
> call to her doctor.  I'm "flat on my back"
> 2) the knee doctor on Oct 7 was 'not happy' w/ her knee: he had to drain
> more liquid from the knee
> 3) he wanted her to have more therapy
> 4) her next doctor's app't was Oct 30th & Debbie felt that she would not be
> able to return until sometime after that.

Griffith Dep. Exh. P-19.

us for a list of current openings. . . .

Compl. Exh. B.  Both Griffith and Toren testified in their depositions that plaintiff was terminated because of her failure to return to work following the expiration of her FMLA leave, not because of any deficiencies in her job performance.  Griffith Dep. 73-74; Toren Dep. 25, 75-76.  Toren testified that she wrote the termination letter dated October 21 as a result of Griffith having "communicated to [Toren] verbally" that plaintiff would not be returning to work at the expiration of her FMLA leave.  Toren Dep. 85-87.  Toren testified that she did not remember the date plaintiff's FMLA leave was to expire, and that she "contacted someone in the Service Center to determine the date of the FMLA expiration."  *Id*. 88.  She conceded that it "appears" that the October 21 letter was sent one day before plaintiff's leave actually expired, on October 22, 2004.  *Id*. at 91.

Plaintiff's employee evaluations are mixed.  *See, e.g.*, Smith Dep. Exh. 4 at 9 (2003 job evaluation by Griffith stating that "Debbie's performance continues to be inconsistent" and that she "does not manage her time well and can get behind on calls").  Indeed, shortly before plaintiff's FMLA leave began, in June 2004, Griffith sent plaintiff two e-mails regarding her failure to complete her assigned tasks.  *See* Smyth Dep. Exhs. 5-6.  The second e-mail concluded, "Debbie, you need to improve your performance in regards to the management of the Applixes as soon as possible.  This is your job responsibility and you are not meeting expectations with this job task."  Smyth Dep. Exh. 6.  Toren acknowledged knowing of problems with plaintiff's performance.  Toren Dep. 75.  Toren testified that Griffith "express[ed] frustration" with plaintiff's "absenteeism"

and that Griffith was "tired of dealing with Debbie's absences." *Id*. at 69, 83-84. Toren also heard from Griffith that plaintiff had "problems with her back." *Id*.

Plaintiff testified at her deposition that she received Toren's October 21, 2004 letter by certified mail on either October 21 or October 22, 2004. Smyth Dep. 235-36. Plaintiff did not immediately telephone defendant; she testified that she did not do so because she was "devastated" by the letter and "didn't know what to do." *Id*. at 122. At some point, she called Toren to set up a meeting to discuss the meaning of Toren's letter of October 21, because the letter did not explicitly state that plaintiff's employment had been terminated. *Id*. at 120. Because Toren was unavailable, plaintiff met with another Wawa employee in human resources in November. According to plaintiff, the woman with whom she met was uncertain of the meaning of Toren's letter of October 21, given that the letter did not explicitly state that plaintiff's employment had been terminated. *Id*. at 121. Nevertheless, at the meeting, plaintiff turned over her key fob and work cell phone, and her possessions from her office were returned to her. *Id*. at 120.

On October 25, 2004, plaintiff visited Dr. Jose Cabrera, a neurologist. According to the doctor's letter to plaintiff's primary care physician, plaintiff complained to Dr. Cabrera of severe lower back pain and numbness, for which she had been taking various painkillers. Pl. Resp. Exh. 38. On that date, Dr. Cabrera signed a "certification of medical care" form dated October 25, 2004, to be sent to Unum Provident, Wawa's short-term disability insurer. On the form, Dr. Cabrera checked the box indicating that the patient was "totally incapacitated," and, in the lines provided, indicated that this was true

from "10/25/04 to undetermined."  Smyth Dep. Exh. 12.

Plaintiff was employed for two weeks as a customer service representative at Answering Service Dispatch in 2005, but otherwise has been unemployed since her termination by defendant.  *See* Smyth Dep. 126-27, 132.  She applied for Social Security Disability Insurance ("SSDI") benefits in November 2005.  *See* Def. Mot. Exh. F.  In January 2006 she had further knee surgery.  *See* Pl. Resp. Exh. 34 (surgeon's notes); *see also* Pl. Resp. Exh. 33 (November 2005 note from Dr. Trevlyn discussing plaintiff's pain and MRI showing various injuries to both knees).  She was awarded SSDI benefits on appeal, in December 2006, with an onset of disability date of July 31, 2004.  *See* Smith Dep. Exh.  31.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see IFC Interconsult, AG v. Safeguard Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006).  A genuine issue of material fact exists where the jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over facts is material where it could affect the outcome of the case.  *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

A party seeking the grant of summary judgment carries the initial burden of

informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639. Where the non-moving party bears the burden of proof — as is the case for the claims presently before this court — the moving party must show that the non-moving party cannot support its case with the evidence in the record. *Celotex*, 477 U.S. at 325. In rebuttal, the non-moving party must then identify facts that create a genuine issue of dispute for trial. Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.

Plaintiff claims that defendant violated the FMLA by (1) interfering with her rights by terminating her prior to the end of her leave and (2) retaliating against her for asserting her rights under the FMLA. Plaintiff also claims that defendant violated the ADA by (1) terminating plaintiff because of her disability and (2) retaliating against her for seeking accommodation for her disability.

### A.

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C.

§ 2615(a)(1).  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).  "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brooke Limosine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007).

In its written submissions to this court, defendant moved for summary judgment on plaintiff's FMLA interference claim on the ground that defendant's termination of plaintiff's employment before the conclusion of plaintiff's leave did not interfere with her rights under the FMLA, because plaintiff was unable to return to work at the leave's conclusion.  Defendant contended that "an employer does not interfere with an employee's FMLA rights by terminating an employee during FMLA leave, if the employee would not have been able to return to work at the end of that leave even if not terminated."  Def. Mot. 12.

At oral argument, defendant withdrew this contention, conceding that the ability to return to work at the conclusion of a leave is not an element of an FMLA interference claim, and that plaintiff's interference claim could go forward regardless of whether there was a genuine issue of fact regarding her ability to return to work when her leave expired.

The court welcomes counsel's concession, which, in the court's view, is entirely warranted.  Department of Labor regulations provide that an "employee's entitlement to continued leave, maintenance of health benefits, and restoration cease" during an FMLA

leave only if the employee "*unequivocally advises* the employer either before or during

the taking of leave that the employee does not intend to return to work, and the

employment relationship is terminated."  29 C.F.R. § 825.312(e) (emphasis added).  Here,

there is conflicting evidence regarding whether plaintiff unequivocally advised defendant

that she did not intend to return to work at the expiration of her leave; indeed, defendant's

motion for summary judgment did not contend otherwise.  Griffith and plaintiff give

contradictory accounts of their October 11 conversation, apparently the only

communication from plaintiff to defendant that could arguably form the basis of a defense

under 29 C.F.R. § 825.312(e).[5]

---

[5]The court notes, however, that defendant's position in its moving papers was not
entirely without support in the caselaw.  Defendant cited three cases in support of its
contention that plaintiff's inability to return to work at the conclusion of the leave was a
complete defense to defendant's having terminated her employment before the conclusion
of her leave: a non-precedential Third Circuit opinion, *Katekovich v. Team Rent A Car of
Pittsburgh, Inc.*, 36 Fed. Appx. 688 (3d Cir. 2002) (non-precedential opinion), and two
district court opinions, *Oatman v. Fuji Photo Film U.S.A., Inc.*, No. 00-cv-2116, 2002
WL 245972 (N.D. Tex. Feb. 15, 2002), and *Holmes v. e.spire Commc'n, Inc.*, 135 F.
Supp. 2d 657 (D. Md. 2001).  The court does not find strong support for the existence of
such a defense in any of these cases.

In *Katekovich*, the plaintiff took leave in order to be treated in the psychiatric ward
of a hospital; was never given the notice required under Department of Labor regulations
that her leave was being designated as FMLA leave; was hospitalized for two weeks; and
was informed of her termination approximately one week after her release from the
facility — *i.e.*, three weeks after the start of her hospitalization.  *See* 36 Fed. Appx. at
689-91.  The opinion does not indicate whether she had taken any leave prior to her
hospitalization.  The court affirmed the district court's holding that Katekovich had not
brought forth sufficient evidence to show that she would have been able to return to work
at the conclusion of her FMLA leave, stating, "If an employer terminates an employee
during the twelve weeks but the employee would not have been able to return to work at
the end of the twelve weeks in any event, the employer has not violated the FMLA."  *Id.*
at 690.  In support, the court cited a single opinion from the Sixth Circuit, *Cehrs v.
Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir. 1998), whose

pertinence to *Katekovich*, or, indeed, to the case at bar, is less than clear.  In *Cehrs*, it was undisputed that the plaintiff was unable to return to work at the conclusion of her leave, and that she was not informed that she had been terminated until a number of weeks after the leave ended.  The Sixth Circuit found immaterial the question whether plaintiff's termination was effective four days after the conclusion of her leave or "back-dated" to several weeks earlier, because "it would be elevating form over substance to say that the effective termination date chosen by [the employer] is meaningful to the Court's analysis under the FMLA."  *Id.* at 785.  (The Sixth Circuit has since limited *Cehrs*, acknowledging that *Cehrs* failed to address potentially applicable regulations regarding FMLA notice to employees — "potentially applicable," because gaps in the account of the facts in *Cehrs* rendered the regulations' applicability unclear.  *See Plant v. Morton Intern., Inc.*, 212 F.3d 929, 935 (6th Cir. 2000).)  Whatever may have been the case in *Katekovich* — not all of whose pertinent facts are recited in the non-precedential opinion — in the case at bar the date of plaintiff's termination is not immaterial to her FMLA claim.  Unlike the plaintiff in *Cehrs*, plaintiff was informed of her termination before the expiration of her leave, and her premature termination may have had some bearing on whether she returned to work at the conclusion of her leave.

 *Holmes v. e.spire Commc'n, Inc.*, 135 F. Supp. 2d 657 (D. Md. 2001), more closely resembles the case at bar.  In *Holmes*, on her doctor's order of bed rest, the plaintiff took medical leave for the final three months of her pregnancy.  Holmes informed her employer of her intention to take medical leave at the beginning of a previously scheduled two-week vacation.  Eight days following the birth of her child, her employer told her to return to work in four days' time or risk termination, because her twelve weeks of FMLA leave would expire in four days' time.  Holmes did not return to work and was terminated as threatened.  The employer had calculated the FMLA leave as commencing at the beginning of Holmes's vacation; however, the employer had never informed Holmes that her leave would be designated as FMLA leave.  The court held that, because Holmes's employer failed to give her notice that her vacation would be designated as part of her FMLA leave, she was entitled to twelve weeks of leave dating from the end of her vacation — meaning that her termination came two weeks earlier than it should have.  *See* 29 C.F.R. § 825.208(c) (providing that if the employer fails to give notice to the employee that paid leave will be designated as FMLA leave, the employer may not designate the leave as FMLA leave retroactively).  However, the court also found that there was undisputed evidence (including from Holmes's own deposition) that Holmes was unable to return to work at the end of the later twelve-week period, rejecting Holmes's suggestion, in her brief, that "'it is reasonable to infer that . . . Plaintiff, to save her job, could have returned to work, albeit not the ideal or planned time frame.'"  135 F. Supp. 2d at 665.  The *Holmes* court does not address why it was not an interference with Holmes's rights under the FMLA that she was terminated two weeks before her leave ended.  In support of its holding, the court cites only a Second Circuit case standing for

the slightly tangential propositions that, at the conclusion of twelve weeks, an employee is not entitled to reinstatement if the employee is unable to perform the work, and that an employer's failure to give notice that a leave is designated as FMLA leave is not, in itself, actionable under the FMLA. *Id*. (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc*., 183 F.3d 155, 161-62 (2d Cir. 1999)).

Finally, in *Oatman v. Fuji Photo Film U.S.A., Inc*., No. 00-cv-2116, 2002 WL 245972 (N.D. Tex. Feb. 15, 2002), the plaintiff was terminated three days before his FMLA leave was set to expire. Relying on *Holmes*, the court granted the employer's motion for summary judgment on the ground that the plaintiff admitted that he was unable to return to work on the date his FMLA leave ended.

There would be obvious dangers to a rule that a plaintiff's inability to prove she was able to return to work at the end of her FMLA leave would constitute a complete defense to an action for FMLA interference where the plaintiff's employment was terminated for failure to return following FMLA leave before her employer-approved leave even concluded, and where the plaintiff did not give unequivocal notice of her intention not to return to work. Regardless of whether the employee turns out to be unable to return to work at the conclusion of the FMLA leave, terminating an employee before the conclusion of an employer-approved leave (without the statutorily required unequivocal indication from the employee that the employee intends not to return to work) may cause damages cognizable under the FMLA — for instance, the denial of the employer's contribution toward a plaintiff's health care premium for the period between the termination and the conclusion of the leave. *Cf*. 29 U.S.C. § 2614(c) (providing that an employer remains responsible for its contribution toward an employee's health benefits during an FMLA leave even if, at the leave's conclusion, the employee fails to return to work due to the employee's serious health condition, or for another reason outside the employee's control). Allowing an employer to terminate an employee's employment before the end of the employee's FMLA leave if — in the employer's view — the employee seemed sufficiently ill that the employee would be unable to return at the leave's conclusion would fundamentally undermine the protection accorded to employees under the FMLA. Moreover, such a regime is contradicted by the Department of Labor's interpretation of the statute in its regulation providing that an employer may terminate employment during an FMLA leave only upon "unequivocal" notice from the employee that the employee intends not to return to work (or for reasons unrelated to the employee's FMLA leave). *See* 29 C.F.R. § 825.312(e).

Defendant also represented in its moving papers that *Rinehimer v. Cemcolift Corp*., 292 F.3d 375 (3d Cir. 2002), "held that 'the ability to return to work and to perform the essential functions of [her] job before the expiration of [her] leave is an essential element of a FMLA claim, which the plaintiff has the burden to establish.'" Def. Mot. 15 (quoting *Rinehimer*, 292 F.3d at 384). That quotation from *Rinehimer* needs to be read in context, and was not a square holding of *Rinehimer*. Rinehimer did indeed

-15-

Defendant's sole argument for summary judgment on plaintiff's FMLA interference claim was that plaintiff had failed to come forth with sufficient evidence that she was able to return to work at the conclusion of her leave.  Because defendant has conceded that plaintiff need not prove this fact as an element of her cause of action, the court will deny the motion for summary judgment on the FMLA interference claim.

## B.

Defendant has moved for summary judgment on plaintiff's FMLA retaliation claim on the grounds that (1) there was no adverse employment decision, because plaintiff was unable to return to work after the conclusion of her leave, and (2) plaintiff has failed to produce any evidence that the reason for her termination was pretextual.

To establish a prima facie case of retaliation under the FMLA, plaintiff must show that: (1) she took FMLA leave; (2) she suffered an adverse employment action; and (3) there was a causal connection between her leave and the adverse employment action. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

A plaintiff must prove an FMLA discrimination or retaliation claim under the

---

have the burden of proving his ability to return to work, since, after he was unable to return to work following the conclusion of his leave, his employer denied his reinstatement on that ground — as employers have the right to do, *after* a leave concludes.  *See* 292 F.3d at 378-79.  However, as defendant in the case at bar conceded at oral argument, plaintiffs do not have the burden of proving an ability to return to work as an element of every FMLA interference claim.  Where, for instance, an employee is denied FMLA leave entirely, it would be nonsensical to attempt to prove that a plaintiff was able to return to work after a hypothetical leave.

familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Peter v. Lincoln Tech. Inst., Inc.*, 255 F. Supp. 2d 417, 444-45 (E.D. Pa. 2002).  Once a plaintiff has established a prima facie case, the defendant must produce evidence of a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action.  The plaintiff then bears the burden of producing evidence that the stated reason is pretextual.

"In order to create a genuine issue of material fact as to whether the proffered reasons are pretextual," the plaintiff must "'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  "In other words," the plaintiff "must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.'"  *Id*. (quoting *Fuentes*, 32 F.3d at 765) (internal quotation marks omitted).

Defendant argues, first, that plaintiff suffered no adverse employment action because "the termination of Smyth's employment was not due to a decision made by Wawa" since "Smyth was unable to return to work and perform the essential functions of

her job at the end of her job at the end of her FMLA leave." Def. Mot. 16.[6]  In support of

its position that plaintiff cannot possibly prove that she was able to return to work on

October 25, 2004, defendant cites the "certification of medical care" signed by Dr.

Cabrera on October 25, 2004.  On the form, Dr. Cabrera checked the box indicating that

the patient was "totally incapacitated," and indicated on the lines provided that this was

true from "10/25/04 to undetermined."  Smyth Dep. Exh. 12; *see also* Pl. Resp. Exh. 38

(Cabrera letter to plaintiff's primary care physician dated October 25, 2004); *id*. Exh. 39

(Cabrera letter of December 7, 2004).  According to Dr. Cabrera's October 25 letter to

plaintiff's primary care physician, plaintiff complained to Dr. Cabrera of severe lower

back pain and numbness, for which she had been taking various painkillers.  *See id*.

      However, plaintiff has produced countervailing evidence from which a jury could

reasonably conclude that plaintiff could have returned to work.  First, plaintiff testified

that, "whatever it took, I was returning to work. . . . If someone would have said to me

_____

     [6] At oral argument, plaintiff and defendant agreed that, consistent with the
reasoning of *Gibson v. Lafayette Manor, Inc.*, 2007 WL 951473 (W.D. Pa. Mar. 27,
2007), "an employee, who is terminated after the expiration of FMLA leave because the
employee is unable to perform the essential functions of the job at the time of termination,
has failed to establish the requirement of an adverse employment action for a FMLA
retaliation claim."  *Id*. at *19 (citing *Dogmantis v. Capital Blue Cross*, 413 F. Supp. 2d
452, 460 (E.D. Pa. 2005)).  It is not clear to the court that the rule in *Gibson* should apply
here, where plaintiff alleges that she was terminated *before* the expiration of her leave,
and where much of the evidence cited by defendant regarding plaintiff's alleged inability
to return to work was acquired by defendant only after plaintiff's termination.  *See Edgar
v. JAC Prods., Inc.*, 443 F.3d 501, 513 (6th Cir. 2006) (holding that "in a retaliation case,
after-acquired evidence of an employee's inability to return to work cannot be used to
shield a defendant from liability, but should be considered in determining the appropriate
remedy for the FMLA violation").  However, because plaintiff has not raised this
question regarding *Gibson*'s applicability in the case at bar, the court need not address it.

you're terminated if you don't come back on the 25th, I would have been at work. . . . I did not [return to work on the 25th] because I didn't — I was terminated."  Smyth Dep. 98.  Second, plaintiff's knee surgeon, Dr. Dean Trevlyn, noted on October 7, 2004, that plaintiff was "doing well" and "will be getting back to work at the end of this month."  Pl. Resp. Exh. 31.  Plaintiff's knee surgery was the reason she had taken the leave in the first place.  Dr. Trevlyn also has provided a sworn affidavit stating that, when he wrote the October 7 note, he "did not foresee any problems that would have interfered with her intention to go back to work at that time, although I may have issued some work restrictions, such as no kneeling, stooping, etc."  Pl. Resp. Exh. 51.  He further attests that "If Ms. Smyth had informed me that she had to return to work or else she would lose her job at Wawa, I absolutely would have provided a return to work certificate to her."  *Id.*

Dr. Cabrera's October 25th certification is obviously difficult for plaintiff's case.  However, plaintiff's testimony, combined with the unequivocal contemporaneous evidence that Dr. Trevlyn thought her knee was in good shape, is more than a "scintilla" of evidence that plaintiff would have been able to return to work on October 25.  Depending on its assessment of the credibility of plaintiff's testimony as well as the other evidence in the case, a jury could reasonably conclude that, had plaintiff not been notified of her termination by Toren's October 21 letter, she would have been at work on October 25, rather than at Dr. Cabrera's office.

Second, with regard to pretext, defendant contends that plaintiff produced no evidence suggesting that defendant's stated reason for terminating plaintiff — that she

"held a critical quality assurance position," "was unable to return to work at the end of her FMLA leave, and was unable to tell Wawa when she would return to work" — was motivated by retaliatory reasons.  Def. Mot. 18; *see also* Pl. Resp. Exh. 32 (termination letter); Griffith Dep. 73-74 (testifying that reason for termination was failure to return following leave); Toren Dep. 25, 75-76 (same).

Plaintiff has met her burden of responding with evidence that defendant's reason is pretextual.  First and most importantly, as plaintiff contends, defendant's stated reason — that plaintiff had failed to return to work following the expiration of her leave — suffers from a degree of inherent implausibility, given that, according to the undisputed evidence, defendant sent a letter of termination to plaintiff before her FMLA leave actually concluded.  *See* Pl. Resp. 31-32.  When defendant terminated plaintiff's employment on October 21, 2004, more than a week had passed without an update from plaintiff regarding her condition (from October 11, 2004, onward).  Viewing the evidence in the light most favorable to plaintiff, as the court must, defendant had not received from plaintiff an unequivocal statement that she did not intend to work; indeed, the letter terminating her employment did not cite any such statement from plaintiff, but simply the expiration of her leave.

Second, as plaintiff also notes, there is considerable evidence that plaintiff's supervisor Griffith was aware that this FMLA leave was plaintiff's third since 2000, and that Griffith was displeased with plaintiff's taking so much time off from work.  *See* Pl. Resp. 29.  This evidence includes Toren's testimony that Griffith had spoken with Toren

regarding her displeasure at plaintiff's absenteeism; Griffith's performance evaluations of plaintiff, criticizing plaintiff as not a "team player" for her absences; plaintiff's deposition testimony regarding her fear of being terminated for taking the leave, including the fact that she consulted her co-workers to determine the best way of broaching the subject of taking the leave with Griffith; contemporaneous notes by plaintiff's doctor mentioning plaintiff's anxiety over the possibility of losing her job as a result of her July 2004 knee surgery; and plaintiff's June 2004 e-mail to Griffith confronting Griffith about plaintiff's suspicion that Griffith's dissatisfaction with plaintiff's work was caused in part by plaintiff's medical conditions. The arguable implausibility of defendant's given reason for terminating plaintiff's employment, combined with the circumstantial evidence that plaintiff's supervisor was displeased with plaintiff for taking medical leaves, is more than sufficient to allow a reasonable factfinder to disbelieve defendant's stated reason for terminating plaintiff. *See Tomasso*, 445 F.3d at 706.

The court will therefore deny defendant's motion for summary judgment on plaintiff's FMLA retaliation claim.

## C.

Defendant has moved for summary judgment on plaintiff's ADA discrimination claim on the grounds that judicial estoppel bars plaintiff's claim and that plaintiff has failed to make out a *prima facie* case.

### 1. Judicial Estoppel

Defendant first contends that plaintiff is judicially estopped from pursuing her

ADA claims because, according to her statements in support of her applications for SSI

disability benefits, she was completely disabled and unable to perform her job.

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the

Supreme Court held that an ADA plaintiff's statements in support of an application for

Social Security disability benefits do not necessarily estop the plaintiff from claiming in a

subsequent ADA lawsuit that plaintiff could have performed her job with reasonable

accommodation.  The Court so held "because there are too many situations in which an

SSDI claim and an ADA claim can comfortably exist side by side" — for instance, where

the plaintiff's medical condition changed over time, or where plaintiff could perform her

work only with reasonable accommodations (required by the ADA, but not taken into

account in deciding an SSDI application).  *Id*. at 803-5.  However, "an ADA plaintiff

cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total

disability claim.  Rather, she must proffer a sufficient explanation."  *Id*. at 806.  In

*Cleveland*, the Court found it a sufficient explanation that plaintiff's statements of total

disability were made in a context where reasonable accommodations are not taken into

account, and that her statements were "accurate . . . if examined in the time period in

which they were made."  *Id*. at 807 (internal quotation marks omitted).

Plaintiff first applied for disability benefits in November 2005.  Defendant points

to various statements in plaintiff's SSDI applications that she was "unable to work," "still

disabled," or "totally incapacitated," as well as plaintiff's apparently false representation

that she had not worked since her July 2004 knee surgery (in fact, plaintiff was employed

for approximately two weeks in the fall of 2005).  *See* Def. Mot. 20-21 & Exh. F; Smyth

Dep. Exh. 29.  Although plaintiff's initial application was unsuccessful, plaintiff

prevailed on appeal and, in December 2006, was awarded benefits.  The agency found

plaintiff disabled from July 31, 2004, the date of her knee surgery.  *See* Smyth Dep. Exh.

31.

In response, plaintiff offers several explanations of the discrepancy between her

statements in her SSDI applications and her allegation that she could have performed her

job in October 2004 with reasonable accommodation.  First, plaintiff notes that the

statements in her initial application were made in November 2005, more than a year after

her termination from Wawa in October 2004.  At that time, she had suffered additional

knee injuries.  *See* Pl. Resp. Exh. 33 (November 2005 note from Dr. Trevlyn discussing

plaintiff's pain and MRI showing various injuries to both knees).  Second, plaintiff notes

that she made the statement that she was "totally incapacitated" only on appeal, shortly

after her knee surgery in January 2006.  Pl. Resp. 54; *see also*; Pl. Resp. Exh. 34

(surgeon's notes from January 6, 2006 knee surgery).  Nearly every answer in plaintiff's

January 2006 appeal statement qualifies her report of symptoms and limitations as

existing "presently" due to her recent knee surgery.  *See* Pl. Resp. Exh. 56 ("with recent

surgery, need assistance with bathing, dressing"; "cannot drive due to recent surgery and

surgery that will be needed in a few months"; "presently, due to knee surgery"; "presently

cannot complete at all"; "presently cannot do at all"; "presently, because of surgery,

cannot do"; and so on).

The court concludes that, as in *Cleveland*, a reasonable jury could find reconcilable the inconsistency between plaintiff's allegation regarding her condition in October 2004 and her subsequent statements in November 2005 and January 2006 on the ground that plaintiff's SSDI statements were true when made. That is, given that the statements were made more than a year after plaintiff's termination, when she had sustained additional knee injuries, they do not necessarily contradict the allegation that plaintiff was able to perform her work with reasonable accommodation when she was terminated in October 2004.

The court will therefore deny defendant's motion on the judicial estoppel ground.

**2. Plaintiff's *Prima Facie* Case**

Defendant contends that plaintiff has failed to make out a *prima facie* case of ADA discrimination because there is no evidence that plaintiff was disabled or regarded as disabled at the time of her termination, and because plaintiff was unable to perform the essential functions of her job.

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must prove that she (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an adverse employment decision as a result of discrimination. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). The determination whether a plaintiff is a qualified person with a disability protected by the ADA is made with regard to the date of the adverse

-24-

employment decision.  *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(2).  The Equal Employment Opportunity Commission's ("EEOC") regulations provide that, under the ADA, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  "Substantially limits" is defined as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  *Id*. § 1630.2(j)(1).  In making this determination, a court must consider "[t]he nature and severity of the impairment," its "duration or expected duration," and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  *Id*. § 1630.2(j)(2).

Plaintiff contends that her "degenerative joint condition" substantially limits three major life activities: walking, concentrating, and sleeping.

**i. Disability: Walking**

With regard to walking in particular, the EEOC's regulations define a person with

a walking disability as someone who "can only walk for very brief periods of time."  29
C.F.R. § 1630.2(j) App; *see Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 185-87 (3d
Cir. 1999) (holding that plaintiff did not have walking disability because he could walk
for fifty minutes at a time, which was not a "very brief" period).

Plaintiff contends that she has raised a genuine issue of material fact regarding
whether she was substantially limited in her ability to walk.  She cites her deposition
testimony that, at the time she went on leave in July 2004 to have her knee surgery, if she
"walked distances and stand [sic] long times" her knees would "swell" and "bother" her.
*See* Smyth Dep. 164.  She also cites seventeen doctor's notes.  *See* Pl. Resp. 36.  Several
of the notes concern plaintiff's neck pain and surgery and do not mention any consequent
effect on her ability to walk.  Other notes document the knee injuries and pain that led to
surgeries in 2003, 2004, and 2006.

Plaintiff has failed to produced evidence that she is permanently or in the long-
term unable to walk except for "very brief periods of time."  *Cf.* 29 C.F.R. § 1630.2(j)
App.  Although plaintiff's memorandum in response to the motion for summary judgment
refers to plaintiff's "degenerative joint condition," plaintiff has not produced evidence
describing a permanent, long-term condition substantially limiting her ability to walk.
Rather than a permanent, long-term condition, the record reflects a series of temporary
knee injuries, for which plaintiff has received treatment.  For instance, as defendant notes,
at the time of plaintiff's termination, in October 2004, plaintiff's knee-doctor Dr. Trevlyn
was satisfied with plaintiff's recovery from her July 2004 knee surgery for her torn ACL.

-26-

And, on October 25, 2004, Dr. Cabrera noted that plaintiff was "able to ambulate without any assistance."  *See* Pl. Resp. Exhs. 31, 38, 50.

The court therefore finds that plaintiff has failed to raise a genuine issue of material fact regarding whether, at the time of her termination, she was disabled based on her limitations in walking.

### ii. Disability: Sleeping

Although the Third Circuit has not acknowledged sleeping as a major life activity in a published opinion, other courts of appeal have made it clear that a plaintiff must produce evidence of a severe difficulty sleeping in order to survive a motion for summary judgment on this ground.  *See, e.g.*, *Squibb v. Memorial Mem. Center*, 497 F.3d 775, 784 (7th Cir. 2007) (requiring evidence of "prolonged, severe and long-term" limitations on sleeping and rejecting as insufficient plaintiff's "generalized assertions that she is unable to sleep for substantial periods of time, unsupported by any additional evidence, medical or otherwise, and unenhanced by claims that this lack of sleep affects her daytime functions"); *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005) (holding that an employee who could sleep for no more than two and a half hours at a time, for a total of five hours per night, was not disabled); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316-17 (6th Cir. 2001) (holding that inability to sleep more than four to five hours per night did not demonstrate a substantial limitation in the major life activity of sleeping as compared to the average person's ability to sleep); *see also Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1061 (9th Cir. 2005) (holding that a plaintiff's testimony that he

was limited to five or six hours of sleep with the assistance of medications that hampered his daytime functions and that, even with medications, sometimes he could not sleep at all, was sufficient to withstand summary judgment on whether he had a substantial impairment in the major life activity of sleeping); *Peter v. Lincoln Tech. Inst., Inc.*, 255 F. Supp. 2d 417, 433-34 (E.D. Pa. 2002) (denying employer's motion for summary judgment on plaintiff's alleged sleep disability because plaintiff had been diagnosed with severe sleep apnea which caused her to fall asleep repeatedly throughout the day, including falling asleep on her feet and while transferring phone calls, despite extensive medical treatment for the condition).  Defendant cites a non-precedential opinion in which the Third Circuit echoed its sister circuits: "Difficulty sleeping is a common problem, and not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction." *Sloan v. City of Pittsburgh*, 110 Fed. Appx. 207, 212 (3d Cir. 2007) (non-precedential opinion).

The evidence produced by plaintiff — three brief notes by doctors from 2001 and 2006 mentioning that plaintiff was having trouble sleeping and plaintiff's deposition testimony that she told Griffith that she sometimes had difficult concentrating due to her lack of sleep — falls far short of showing, or even suggesting, the kind of severe affliction that might qualify plaintiff as disabled under the ADA in October 2004.  The court therefore finds that plaintiff has not raised a genuine issue of material fact regarding whether she was disabled due to her difficulties sleeping.

### iii. Disability: Concentrating

Defendant contends that plaintiff has offered only a mere scintilla of evidence that she has difficulty concentrating.  Def. Rep. 20-21.  In response to defendant's motion for summary judgment on this issue, plaintiff cites only plaintiff's deposition testimony that she told her supervisor Griffith, "I was having trouble sleeping at night because I was in pain, which caused me to have concentration problems . . . Trying to stay focused at work because I was in so much pain, and lack of sleep."  Pl. Resp. 38 (quoting Smyth Dep. 154).  This conversation apparently took place during plaintiff's employee evaluation.  *See* Smyth Dep. 164.  The court agrees with defendant that this evidence is far from sufficient to create a genuine issue of material fact.  *Cf. Gagliardo v. Connaught Labs. Inc.*, 311 F.3d 565, 569-70 (3d Cir. 2002) (holding that jury could reasonably conclude that plaintiff had concentration and memory disability based on testimony from plaintiff's physician, co-workers, and family that plaintiff suffered fatigue and cognitive impairments, for which she had received accommodations at work, and that the impairments were caused by her multiple sclerosis).

In sum, plaintiff has failed to produce evidence from which a rational jury could conclude that she was substantially limited in the major life activity of walking, sleeping, or concentrating.

**iv. "Regarded As" Disabled Claim**

Plaintiff also claims, that, even if she was not actually disabled due to her physical and mental impairments, she qualifies as a person with a disability under the ADA because her employer regarded her as disabled.  *See* 42 U.S.C. § 12102(2)(C).

-29-

Defendant's motion contends that plaintiff has failed to present any evidence that defendant regarded her as disabled.  In response, plaintiff does not cite any evidence that defendant regarded her as being disabled — that is, believed she had a substantially limiting impairment that she did not have, or erroneously believed that an impairment that she did have was substantially limiting, *see Sutton v. United Airlines, Inc.*, 527 U.S. 471, 478 (1999).  Rather, plaintiff only cites evidence that defendant had been informed of plaintiff's medical conditions and her need to take leave for medical reasons, and that plaintiff's supervisor Griffith was displeased with plaintiff's frequent absences from work.  *See* Pl. Resp. 40-41.  Her claim must therefore fail, because "'the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled.'"  *Buskirk v. Apollo Metals*, 307 F.3d 160, 167 (3d Cir. 2002) (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (holding same)).

**v. "Record of Disability" Claim**

Plaintiff also claims, that, even if she was not disabled at the time of her termination, she qualifies as a person with a disability under the ADA because she has a record of having a disability.  *See* 42 U.S.C. § 12102(2)(B).  Defendant contends that plaintiff's claim that she is a person with a "record of" a disability must fail because plaintiff has not produced sufficient evidence that she was ever disabled.  Plaintiff does not cite evidence in support of her "record of disability" claim other than the evidence already discussed above.  "A plaintiff attempting to prove the existence of a 'record' of

disability still must demonstrate that the recorded impairment is a 'disability' within the meaning of the ADA." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 513 (3d Cir. 2001).  Accordingly, for the reasons stated above with regard to plaintiff's claim that she was disabled based on her physical and mental impairments, the court finds that plaintiff has failed to raise a genuine issue of material fact concerning whether she has a "record of" being disabled.

## vi. Conclusion

Because plaintiff has not produced sufficient evidence from which a jury could reasonably conclude that she was disabled, had a record of disability, or was regarded as disabled, plaintiff has failed to make out a *prima facie* claim under the ADA.

## D.

Defendant has moved for summary judgment on plaintiff's ADA retaliation claim on two grounds, (1) that there was no adverse employment decision because plaintiff did not return to work, and (2) that there was no causal link between plaintiff's request for an accommodation (in the form of a laptop) and her termination, given that the laptop request came four years before her termination.

"To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  A plaintiff can show the required

causal connection through timing, a pattern of antagonism, or "other circumstantial evidence" from which causation could be inferred, including "by showing that the employer gave inconsistent reasons for terminating the employee." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Defendant contends that plaintiff's termination does not qualify as an adverse employment action because plaintiff was unable to return to work at the conclusion of her leave. Def. Mot. 30. For the reasons stated above with regard to plaintiff's FMLA claim, the court finds that plaintiff has produced sufficient evidence for a reasonable jury to conclude that she was, in fact, able to return to work, and that she therefore suffered an adverse employment action when she was terminated by defendant.

With regard to causation, the court finds that there is sufficient evidence for a reasonable jury to conclude that there was a causal link between plaintiff's termination and her alleged protected activity, namely, the complaint of disability discrimination against plaintiff's supervisor Griffith in June 2004, and plaintiff's request for an accommodation in the form of a laptop. Pl. Resp. 43; *see* Compl. ¶¶ 18, 22. This evidence of causation includes plaintiff's testimony regarding her fear of informing Griffith about her need to take leave, based on Griffith's reaction to previous leaves and her comments regarding plaintiff's performance, which prompted her to consult her co-workers concerning the best way to break the news of her need to take a leave to Griffith; plaintiff's e-mail to Griffith shortly before taking her leave confronting Griffith with her suspicion that Griffith's assessment of plaintiff's job performance was based in part on

plaintiff's medical conditions, combined with the fact that Griffith was involved in

plaintiff's termination; and the arguable implausibility of defendant's stated reason for

terminating plaintiff.

The court will therefore deny defendant's motion for summary judgment on

defendant's retaliation claim.

## E.

In its reply to plaintiff's response, defendant has moved for summary judgment on

plaintiff's putative claim for failure to accommodate under the ADA.  Def. Reply 25-26.

Defendant contends that plaintiff has no such claim, because plaintiff failed to plead a

failure to accommodate claim.  Defendant further contends that any amendment to the

complaint including a failure to accommodate claim would be futile because plaintiff is

not disabled within the meaning of the ADA.

The Third Circuit has held that, under the general rule that courts will construe

facts favorably to a pleader but "will not read causes of action into a complaint when they

are not present," a court shall not "read in" a cause of action for failure to accommodate

where a plaintiff has failed to plead one, "even when the complaint's background section

makes a brief reference to failure to accommodate."  *Krouse v. Am. Sterilizer Co.*, 126

F.3d 494, 499 n.1 (3d Cir. 1997) (plaintiff pled retaliation only).  Here, plaintiff's

complaint, drafted by counsel, does not include a cause of action for failure to

accommodate.  *See* Compl. ¶¶ 38-41.  Accordingly, the court will dismiss defendant's

motion as moot with regard to this would-be claim.[7]

### F.

Finally, defendant seeks partial summary judgment on the issue of damages, on the grounds that plaintiff is (1) ineligible for back pay for the periods in which she was unable to work or voluntarily out of the labor market, and (2) ineligible for front pay because she is ineligible for reinstatement.  Def. Mot. 32-35; Def. Reply 28.

With regard to back pay, plaintiff concedes that she is not eligible for back pay during periods in which she was unable to work.  Pl. Resp. 55.  She contends, however, that there are disputed questions of fact concerning whether and when she was or was not able to work following her FMLA leave.  Pl. Resp. 56.  For the reasons stated above with regard to plaintiff's FMLA claim, the court agrees that there are disputed issues of material fact regarding plaintiff's ability to work.  The court will therefore deny defendant's partial motion for summary judgment on the issue of back pay.

With regard to front pay, defendant contends that plaintiff is not eligible for reinstatement because plaintiff was convicted of simple assault and making terroristic threats in an incident at a Wawa store on January 10, 2005.  *See* Smyth Dep. Exh. 37. The record contains an affidavit from a Wawa employee, Karen Genello, stating that

---

[7] Because plaintiff has not sought leave to amend her complaint, the court will not rule on whether any such amendment would be futile.  The court notes, however, that an element of a failure to accommodate claim is that a plaintiff prove that she is disabled within the meaning of the ADA.  *See Conneen v. MBNA Am. Bank, N.A.*, 182 F. Supp. 2d 370, 376 (D. Del. 2002).  It therefore appears that a failure to accommodate claim is foreclosed by the court's holding in this order that plaintiff has not produced sufficient evidence for a reasonable jury to conclude that she is disabled under the ADA.

"Wawa conducts background checks, including criminal background checks, on all applicants for employment or reemployment" and that "[a]n applicant for employment or reemployment with a criminal record involving simple assault and terroristic threats arising from an incident at a Wawa store[] is not eligible for hire or rehire."  Def. Mot. Exh. H.[8]

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  *Pollard v. E.I du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001).  "For instance, when an appropriate position for the plaintiff is not immediately available without displacing an incumbent employee, courts have ordered reinstatement upon the opening of such a position and have ordered front pay to be paid until reinstatement occurs."  *Id*.  "In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement."  *Id*.

---

[8] Plaintiff has moved to strike the affidavit on the ground that plaintiff was not given notice of Genello during discovery.  *See* Docket No. 20.  In response to plaintiff's motion, on June 28, 2007, defendant amended its disclosure statement and offered plaintiff the opportunity to depose Genello.  Defendant has not offered a "substantial justification" for failing to disclose earlier the information in Genello's affidavit, *see* Fed. R. Civ. P. 37(c)(1), stating only that "Wawa did not realize until after the close of the discovery period that the Statement of Karen Genello would be needed to support its Motion."  *See* Docket No. 23.  However, because plaintiff was offered the opportunity to depose Genello, the court finds the failure to disclose harmless and on that ground will deny the motion to strike.

In *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), the Supreme Court held that where an employer, after terminating an employee on unlawful grounds, discovers grounds on which the employer could have lawfully terminated the employee, "neither reinstatement nor front pay is an appropriate remedy": "It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *Id.* at 361-62. In *McKennon*, the employee misconduct at issue was the plaintiff's copying of confidential files regarding her employer's financial circumstances and her disclosure of those files to her husband during her employment; the plaintiff testified that she copied the files for "'protection'" and "'insurance'" because she was worried that "she was about to be fired because of her age." *Id.* at 355. Describing its holding in *McKennon* as a "general rule in cases of this type," the Court acknowledged that "the factual permutations and the equitable considerations [such cases] raise will vary from case to case." *Id.* at 362.

Plaintiff contends that (1) the incident at the Wawa store resulting in her arrest and convictions "would never have happened, but for Wawa's illegal termination of Smyth," and (2) "the defense of after-acquired evidence is inapplicable here, as it is reserved for that conduct which occurs during the employer-employment relationship." Pl. Resp. 57 (emphasis deleted).

The facts of the case at bar do differ from those of *McKennon* in that, in this case, the wrongful conduct by plaintiff occurred after her termination by defendant. Although

the Third Circuit has not addressed whether *McKennon*'s reasoning extends to

misconduct by the plaintiff post-dating the plaintiff's unlawful termination,[9] the Eighth

Circuit — the only court of appeals to decide the question — has answered it in the

affirmative.  In *Sellers v. Mineta*, 358 F.3d 1058, 1063-65 (8th Cir. 2004), the Eighth

Circuit vacated an award of front pay and remanded to the district court for a

determination whether the employee's post-termination conduct — at a new employer,

attempting to process an unauthorized loan application in the name of her spouse's ex-

wife, which led to her being fired — rendered her ineligible for reinstatement and front

pay.  The court reasoned:

> Front pay is a disfavored remedy that may be awarded in lieu of reinstatement, but
> not in addition to it, where the circumstances make reinstatement impractical.  The
> availability of front pay as a remedy thus presupposes that reinstatement is
> impractical or impossible due to circumstances not attributable to the plaintiff.  It
> would be inequitable for a plaintiff to avail herself of the disfavored and
> exceptional remedy of front pay where her own misconduct precludes her from
> availing herself of the favored and more traditional remedy of reinstatement.

*Id*. at 1063-64 (citations omitted).  *But see Carr v. Woodbury County Juv. Det. Ctr.*, 905

F.Supp. 619, 627-28 (N.D. Iowa 1995) (holding that *McKennon* applies only to

misconduct during plaintiff's employment with defendant, because the employer's

"policies governing employment simply cannot properly, by which I mean either legally

or equitably, be imposed upon a person after his or her employment has terminated");

---

[9] The Third Circuit has noted, however, that "the Supreme Court did not limit the
general principles articulated in *McKennon* to cases involving on-the-job misconduct,
instead using the broader term 'wrongdoing' as well as listing both types of after-acquired
evidence cases (resume fraud cases and cases of on-the-job misconduct)."  *Mardell v.
Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 n.4 (3d Cir. 1995) (per curiam).

*Ryder v. Westinghouse Electric Corp.*, 879 F. Supp. 534, 537-38 (W.D. Pa. 1995) (noting in dicta that "it is not clear that the after-acquired evidence doctrine ha[d] any application at all" in the case because the definition of the doctrine "presupposes that there was an employer-employee relationship at the time the misconduct occurred"); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 682 (S.D.N.Y. 1995) (holding that *McKennon* "is premised on the employee's misconduct occurring during her employment").

The Tenth Circuit, too, has indicated that, under certain circumstances, post-termination misconduct may bar front pay under *McKennon* — but the court declined to apply the rule, for reasons relevant here.  In *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir. 1999), the alleged post-termination misconduct was plaintiff's "conduct at his unemployment compensation benefits hearing, during which he 'touched and cursed at Defendant's counsel.'" *Id*. at 555 (quoting appellant's brief).  The district court refused to give defendant's proposed jury instruction that "plaintiff's conduct after he had been terminated could serve to limit damages if defendant showed that the conduct 'was of such severity that the Plaintiff in fact would have been terminated on those grounds alone.'" *Id*. at 554 (quoting proposed instruction).  The Tenth Circuit held that the district court had not abused its discretion.  Although the court did not "foreclose the possibility that in appropriate circumstances the logic of *McKennon* may permit certain limitations on relief based on post-termination conduct," the court declined to apply the rule because "[t]he alleged misconduct to which defendant points occurred at a hearing occasioned by

plaintiff's termination." *Id.* at 555.  The court stated, "In this case, as in most cases in

which the alleged misconduct arises as a direct result of retaliatory termination, the

necessary balancing of the equities hardly mandates a *McKennon*-type instruction on

after-occurring evidence." *Id.*[10]

Given the concern raised by plaintiff and shared by the Tenth Circuit in *Medlock*,

the court finds it premature to weigh the equities regarding front pay.  At this stage, the

court is not prepared to declare it inconceivable that, upon a full factual record and

following a jury verdict for plaintiff, the court would find that, despite plaintiff's post-

termination misconduct in a Wawa store, plaintiff nevertheless merited equitable relief in

the form of reinstatement or front pay.  The court will therefore deny summary judgment

on the front pay issue.

### IV.

For the foregoing reasons, the court will deny defendant's motion with respect to

plaintiff's FMLA claims, her ADA retaliation claim, and the proposed limitations on

damages.  The court will grant the motion with respect to her ADA discrimination claim.

The court will dismiss the motion as moot with respect to her state law claims and

putative claim for failure to accommodate under the ADA.  An appropriate order follows.

---

[10] In a footnote, the Tenth Circuit commented, "It is not difficult to envision a
defendant goading a former employee into losing her temper, only to claim later that
certain forms of relief should be unavailable because it would have discharged the
plaintiff based on her inability to control her temper."  *Medlock*, 164 F.3d at 555 n.7.
This court does not wish to imply that anything of this sort occurred in the case at bar, but
does share this concern about extending *McKennon* to post-termination misconduct.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DEBORAH L. SMYTH,

             Plaintiff,

    v.

WAWA, INC.,

             Defendant

CIVIL ACTION

No. 06-4474

**ORDER**

      **AND NOW**, this 19th day of March, 2008, for the reasons stated in the foregoing opinion, it is hereby **ORDERED**:

1.    Defendant's motion for summary judgment, *see* Docket No. 17, is granted in part, denied in part, and dismissed as moot in part:

    A.    The motion is **DENIED** with respect to plaintiff's claims under the FMLA and with respect to her ADA retaliation claim.

    B.    The motion is **GRANTED** with respect to plaintiff's ADA discrimination claim.

    C.    The motion is **DISMISSED** as **MOOT** with respect to plaintiff's claims under the Pennsylvania Human Relations Act and her putative ADA failure to accommodate claim.

2.    Plaintiff's motion to strike, *see* Docket No. 20, is **DENIED**.

                            /s/ Louis H. Pollak
                            _____

                            Pollak, J.